# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KIM BROWNLEE, on behalf of her minor child, D.Y., | ) ) ) | 10 CV 7100 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| MICHAEL J. ASTRUE, Commissioner, Social Security Administration, | ) ) ) ) | |
| Defendant. | ) ) | September 9, 2011 |

## MEMORANDUM OPINION and ORDER

Kim Brownlee seeks child's supplemental security income ("SSI") benefits under the Social Security Act, 42 U.S.C. § 1382c(a)(3)(C), on behalf of D.Y., her minor daughter. Brownlee claims that D.Y. is disabled by a combination of psychosis, depression, and borderline intellectual functioning. The Commissioner of Social Security issued a final decision denying her claims, and Brownlee appeals. *See* 42 U.S.C. §§ 405(g), 1383(c). Currently before the court are the parties' cross-motions for summary judgment. For the following reasons, Brownlee's motion for summary judgment is granted and the Commissioner's motion is denied.

### Procedural History

Brownlee filed an application for SSI on D.Y.'s behalf in April 2007, claiming that D.Y. had become disabled on August 1, 2006. (A.R. 98.) After the Social Security Administration ("SSA") denied her claim initially and on reconsideration, (id. at 50-51),

Brownlee was granted a hearing before an administrative law judge ("ALJ"), (id. at 20-49). On September 24, 2009, the ALJ denied Brownlee's claims. (Id. at 10-19.) The Appeals Council denied Brownlee's request for review, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Brownlee then filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c); (R. 12).

## Facts

On the date of her hearing before the ALJ, D.Y. was a ten year-old in-coming fifth grader with a years-long history of academic, social, and behavioral struggles. (A.R. 23.) D.Y.'s IQ falls within the second percentile—a cognitive disadvantage which is compounded by her depression and well-documented history of psychological issues. (Id. at 261.) She talks to herself and to imaginary friends, she often speaks in an inappropriate "baby" voice, and she reacts inappropriately to even small challenges at school. (Id. at 145, 262, 341, 559.) All of these issues came to a head in April 2008, when D.Y. was hospitalized for 10 days after experiencing auditory hallucinations including the voices of "bad animals" telling her to kill herself. (Id. at 304-07.) Brownlee claims that the evidence demonstrates that D.Y.'s combination of borderline intellectual functioning, depression, and psychosis render her disabled and entitle her to SSI benefits.

2

### A.   School Records

D.Y.'s academic problems were evident from as early as her first-grade year, when she received D's and C's in all of the core academic curricula. (A.R. 286-88.) D.Y.'s first-grade teacher reported that D.Y. needed to show progress in making appropriate decisions independently, following rules, and accepting teacher guidance. (Id. at 289.) Two years later D.Y.'s academic situation had not improved. On her third-grade report card D.Y. received C's, D's, and F's in reading, writing, and math. (A.R. 297-98.) Her teacher, Cashiene Askew, rated her poorly in conduct and attendance. (Id. at 300.) Askew also commented that D.Y. exerted little effort in class, played when she should be listening, and had been put behind by her "frequent absences and emotional difficulties." (Id. at 301.)

In response to D.Y.'s academic struggles, in the spring of 2007 (at the end of the D.Y.'s third-grade year), Brownlee, Askew, and Chicago Public School ("CPS") administrators met to develop an Individualized Education Program ("IEP") for D.Y. (A.R. 277.) In the IEP the school acknowledged that D.Y. had been diagnosed with depression and anxiety and was being treated with counseling and Prozac. (Id. at 279-81.) Ultimately, the parties to the IEP agreed that D.Y. would attend summer school and repeat the third grade. (Id. at 274.)

In the fall of 2007 D.Y.'s new third-grade teacher, Jessica Shable, completed a teacher questionnaire rating D.Y.'s level of functioning in the categories relevant to Brownlee's SSI application. (A.R. 142-49.) There are six categories, referred to as "functional domains":

3

(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  (Id.)  Shable explained that D.Y.'s history of absenteeism made it difficult for her to discern whether D.Y.'s academic deficits should be attributed to her inability to learn or to her absences.  (Id. at 143.)  Shable did not rate D.Y. as having any serious problems in the area of interacting and relating with others, but commented that she "sometimes talks in an immature 'baby' voice."  (Id. at 145.)  Shable thought D.Y. was exhibiting serious problems in caring for herself, and in particular in handling frustration appropriately, asserting her emotional needs, responding to mood changes appropriately, and using coping skills.  (Id. at 147.)  Shable noted that D.Y. would periodically "shut down," start crying, and refuse to answer questions, and that this isolating behavior "usually lasts until the end of the day."  (Id.)

In December 2008 D.Y.'s fourth-grade special-education teacher, Lisa Pajek, filled out a similar questionnaire documenting significant deterioration in D.Y.'s functioning in the various categories.  (A.R. 532-39.)  Pajek rated D.Y. as having "very serious" problems with seeking attention, expressing anger, and asking permission appropriately, as well as following classroom rules and using appropriate language.  (Id. at 535.)  Pajek rated D.Y. as having a "serious problem" in respecting and obeying adults and in interpreting non-verbal or indirect communication.  (Id.)  Pajek commented that she had implemented some rewards systems to try to help D.Y. improve in these areas, but did not say whether those systems

4

were working. (Id.) In the area of caring for herself, Pajek again rated D.Y. as having "very serious" problems handling frustration, showing patience, appropriately asserting her emotional needs or responding to her mood changes, using appropriate coping skills, and asking for help. (Id. at 537.) Although she noted that D.Y.'s "outbursts of frustration have lessened somewhat," Pajek commented that D.Y.'s psychological and emotional problems "affect her daily and make it difficult for her to complete assignments, ask for help and interact with peers and adults appropriately on a daily/hourly (sometimes) basis." (Id. at 538.)

In February 2009 Brownlee and CPS representatives completed a second IEP for D.Y. (Id. at 543-60.) The IEP reflects that D.Y. needs specialized instruction in dealing with social and emotional issues and in the core academic subjects. (Id. at 546.) D.Y.'s teacher wrote that her inability "to cope with change . . . often results in [D.Y.] leaving the class, which causes safety issues." (Id. at 555, 559-60.) She noted that this happens one to two times each week and that this behavior persisted despite attempts to redirect her. (Id. at 559.) The teacher attributed this behavior to D.Y.'s inability to appropriately cope with frustration or emotions, especially when presented with a task she perceives as difficult. (Id.)

### B. Psychological Evidence

After Brownlee applied for SSI on D.Y.'s behalf, the SSA referred D.Y. for a psychological evaluation. In June 2007 the evaluating clinical psychologist, Mark Langgut, Ph.D., issued his report. (A.R. 229-32.) Langgut wrote that D.Y. presented as "extremely

regressed" and that she "spoke in a feigned 'baby' tone." (Id. at 229.) Langgut also reported

that D.Y. has "depression of mild to moderate intensity," mild anxiety, and "impaired insight

into her own situation." (Id. at 230.) He ran several tests to evaluate D.Y.'s cognitive

abilities and found that "she is functioning in the overall Borderline range." (Id. at 231.)

Two months later consulting physician John Tomassetti reviewed the then-existing

file and provided an evaluation of her RFC. (A.R. 223-228.) Although he acknowledged

D.Y.'s borderline intelligence, depression, anxiety, and periodic crying spells, Tomassetti

concluded that she has no marked or extreme limitations in any of the relevant domains of

functioning. (Id. at 225-26.)

In February 2008, in the middle of D.Y.'s repeat of the third grade, the SSA referred

her to Don White, Ph.D., for a second psychological evaluation. (A.R. 261-65.) White's

testing confirmed that D.Y.'s IQ falls in the second percentile overall. (Id. at 261.) White

acknowledged that D.Y. was taking Prozac and had imaginary friends, but found there to be

"no concrete evidence suggesting psychosis." (Id. at 262.) He rated her as having an

adequate adaptive behavioral functioning, "with the exception of possibly

Interpersonal/Social." (Id. at 264.)

Shortly thereafter a second SSA consulting physician, Margaret Wharton, reviewed

the file and again found that D.Y. had only less than marked limitations in the various

domains of functioning. (A.R. 266-71.) With respect to interacting and relating with others,

Wharton acknowledged D.Y.'s tendency to talk in a baby voice, to shut down, and to

6

experience depression, but said that "[s]he is not a serious behavior problem at school." (Id. at 268.) She did not explain her decision to rate D.Y. as having no limitation in caring for herself. (Id. at 269.)

Two months after White found there to be no concrete evidence of psychosis and three weeks after Wharton concluded that D.Y. has no marked functional limitations, D.Y. was hospitalized for ten days after she wrote a note to Brownlee in which she threatened to kill herself. (A.R. 304, 312.) She wrote the note at the direction of animal voices inside her head. (Id. at 341.) Three weeks earlier, the animals had directed D.Y. to write a note threatening to kill Brownlee. (Id.) During her hospitalization, which spanned from April 1 through April 10, 2008, D.Y. reported that she had been hearing auditory hallucinations since she was six years old. (Id. at 305.) She is quoted as telling her doctor that:

> I had a dream of hitting my head against a wall and then the voices popped in my head. I have two good voices, the elephant and the pony. They tell me to be good. I have two bad voices, the monkey and the dog. That started at my cousin's house. They tell me to do bad things like getting me to crawl under my desk so I can't be seen. . . . I shut them off by washing my hair and if my hair is tied up, I don't let them out. If my hair is down, they come out. The elephant likes grass but I won't eat that. The pony likes a ham sandwich. I have to take the chicken off the bone and wave the bone around my head or the dog gets mad. He gets bigger and bigger on my right side. The monkey gets the banana and I eat two a day for him.

(Id.) She also reported having trouble sleeping, saying that monsters are going to kill her because "I killed one boogie with a chair in the head." (Id.)

During her hospitalization D.Y. exhibited "infantile" behavior and "went between baby talk, crying, and screaming in a curled up form." (Id. at 306-07.) Over time, she

7

reported that the dog, monkey, and pony were fading away. (Id. at 307.) But two days before her discharge D.Y. reported "that the hallucinations were more frequent," and her doctor characterized her as displaying "a near-delusional presentation." (Id.) D.Y.'s doctors diagnosed her as having suicidal ideation and psychosis not otherwise specified, and discharged her to a partial hospitalization program before she could return home full-time. (Id.) Six days later, a doctor at the partial hospitalization program noted that one of D.Y.'s four auditory hallucinations was still present, placing her at risk for harming herself at the hallucination's command. (Id. at 505.) She was discharged from the partial hospitalization program under a "guarded" prognosis and with the recommendation that she continue medication and group and individual therapy. (Id. at 507.) Following her discharge, D.Y. sought treatment at Aunt Martha's Youth Service Center, where she received counseling, prescriptions for Prozac, and an anti-psychotic medication. (Id. at 563-69.)

## C. Hearing Testimony

Brownlee testified at the administrative hearing that D.Y.'s frequent behavioral outbursts in class are a persistent problem for their family. (Id. 34.) Brownlee explained that she receives a call from the school two to three times a week asking her to pick up D.Y., and emphasized that "half of the time" they do not even document the incident. (Id. at 34-35.) She said that D.Y.'s relatively new anti-psychotic medication has "not really" reduced the frequency with which the teacher calls her. (Id. at 36.)

8

The ALJ called licensed clinical psychologist Kathleen O'Brien as a medical expert to provide testimony evaluating D.Y.'s mental impairments under the relevant listings. O'Brien testified that the listing most relevant to D.Y.'s diagnoses is 112.03, which describes schizophrenic, paranoid, and other psychotic disorders. (A.R. 38.) O'Brien testified that although D.Y.'s mental impairments are severe, they do not meet or functionally equal any listed impairment. (Id. at 39.) She rated D.Y. as having less than a marked limitation in interacting and relating with others, reasoning that even though she has a psychotic disorder and trouble handling frustration, she is described in the record as "playing at school and being with others." (Id. at 41.) She testified that D.Y. is typical in caring for herself, and when D.Y.'s attorney pressed her to explain how that could be true given her tendency to run out of the classroom, O'Brien said that behavior falls outside the category of caring for oneself. (Id. at 41, 44-45.)

### D.     The ALJ's Decision

In denying Brownlee's application for child disability benefits, the ALJ found that D.Y. has not engaged in substantial gainful activity and that she has severe impairments in the form of asthma, a mood disorder, and borderline intellectual functioning. (A.R. 13.) The ALJ acknowledged D.Y.'s hospitalization and psychosis diagnosis, but said that after her discharge D.Y. "was described as calm and stable." (Id.) The ALJ next determined that none of D.Y.'s impairments—either individually or in combination—meet, equal, or functionally equal the listings. (Id. at 13-14.) In analyzing whether D.Y.'s impairments

functionally equal the listings, the ALJ gave "very substantial weight" to O'Brien's opinion, and dismissed Brownlee's testimony as "not persuasive." (Id. at 15.) The ALJ found that D.Y. has "less than marked limitation" in all six of the domains of functioning. (Id. at 15-18.) Accordingly, the ALJ concluded that D.Y. is not disabled. (Id. at 18.)

### Analysis

The Personal Responsibility and Work Opportunity Reconciliation Act makes benefits designed for disabled workers available to the disabled children of low-income parents. 42 U.S.C. § 1382c(a)(3)(C)(i); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006). This extension of benefits reflects the recognition that caring for a disabled child "may limit the amount of productive work that the parents can do, inflicting hardship on families of limited means." *Sanchez*, 467 F.3d at 1082. A child is considered disabled—and thus, entitled to benefits—if she has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i).

Because "disabled children generally do not have a work history," their SSI claims are considered under a three-step framework rather than the familiar five-part framework established for adults. *Sanchez*, 467 F.3d at1082. The first two steps of the two frameworks match up: the ALJ first asks whether the child is engaged in substantial gainful activity (if so, the claim is denied) and then asks whether she has a medically severe impairment or combination of impairments (if not, the claim is denied). *See* 20 C.F.R. § 416.924; *Murphy*

10

*v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007). At the third step, the ALJ asks whether the child's impairment meets, or is functionally equivalent to, one of the listings set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. *See Giles v. Astrue*, 483 F.3d 483, 486-87 (7th Cir. 2007). To determine whether an impairment functionally equals a listing, the ALJ evaluates the severity of its impact in six functional domains. 20 C.F.R.§ 416.926a(b)(1). Functional equivalence exists where the ALJ finds that the child has a marked limitation in two of the categories "or an extreme limitation in one." *Murphy*, 496 F.3d at 633; 20 C.F.R. § 416.926a(a). A marked limitation interferes seriously—and an extreme limitation, "very seriously"—with a child's "ability to initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)-(3); *Hopgood v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009).

In moving for summary judgment Brownlee argues that the ALJ erroneously failed to explicitly consider whether D.Y.'s condition meets the criteria of the listing governing psychotic disorders and did not explain why she discarded evidence favorable to Brownlee's claim in analyzing functional equivalence. In its cross-motion the government argues that any error committed by the ALJ in failing to explicitly consider the psychosis listing was harmless and that the ALJ adequately explained her conclusion that D.Y. does not have marked limitations in interacting and relating with others or caring for herself.

This court's review of the Commissioner's decision is limited to determining whether the ALJ committed legal error in reaching her decision and ensuring that there is substantial evidence in the record to support the findings. *Hopgood*, 578 F.3d at 698. Substantial

11

evidence is that which "a reasonable person would accept as adequate to support the decision." *Murphy*, 496 F.3d at 633. In reviewing for substantial evidence this court considers the record as a whole but will not substitute its judgment for the ALJ's either by reweighing facts or credibility determinations. *Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004.) This court will, however, ensure that the ALJ constructed "an accurate and logical bridge from the evidence to her conclusions." *Blakes on behalf of Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). Thus "where the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Giles*, 483 F.3d at 486 (internal quotation omitted).

Brownlee's first and best argument is that the ALJ committed legal error when she failed to mention listing 112.03, let alone explain her conclusion that it is inapplicable here, after Brownlee argued that D.Y.'s mental impairments meet that listing. (*See* A.R. 183-84.) At step two the ALJ did not include D.Y.'s psychosis diagnosis among her severe impairments. (Id. at 13.) The ALJ acknowledged D.Y.'s hospitalization and hallucinations, but said that six days after her discharge "her mood was described as calm and stable with no suicidal thoughts." (Id.) But to the extent this sentence constitutes an explanation rather than a mere recitation of evidence, it hardly explains her decision to exclude the psychosis diagnosis, considering that on the same day D.Y. was described as "calm and stable," her doctor noted that D.Y. was still at risk for harming herself at the command of an on-going auditory hallucination. (Id. at 505.) The ALJ's reliance on the partial portrait of D.Y.'s

status on that particular day to the exclusion of the evidence painting a more grim picture

amounts to the kind of selective review of medical evidence that the Seventh Circuit has

repeatedly admonished ALJs to avoid. *See, e.g., Campbell v. Astrue*, 627 F.3d 299, 306 (7th

Cir. 2010); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

But more to Brownlee's point, at step three the ALJ did not mention any specific

listing in concluding that D.Y.'s combination of impairments does not medically equal a

listing. (A.R. 13-14.) The Seventh Circuit has explained that a remand may be required

where an ALJ neglects to mention a relevant listing and fails to adequately explain that

omission. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Scott v. Barnhart*, 297

F.3d 589, 595 (7th Cir. 2002). Here the ALJ did not address the psychosis listing in her step-

three analysis, and explained her conclusion that D.Y.'s conditions do not medically equal

any listing by noting that the "state agency medical consultants and the medical expert agree

that the claimant's mental impairments do not manifest clinical signs and findings that meet

or equal the specific criteria of any of the Listings." (A.R. 14.) The ALJ's only additional

explanation is her assertion that "I have evaluated the claimant's physical impairment in the

context of the Listings and conclude that she does not manifest clinical signs and findings

that meet the specific criteria of any of the Listings." (Id.) Her reference to a "physical

impairment" suggests that the ALJ's explanation is little more than boilerplate because

D.Y.'s impairments are primarily mental, but perhaps that is unfair nit-picking. *See Shramek

v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). It is not unfair, however, to require the ALJ to

13

provide assurance that she compared the evidence regarding D.Y.'s psychosis to listing 112.03 before concluding that her impairments do not meet that listing. *See Ribaudo*, 458 F.3d at 583.

That assurance is lacking here where the ALJ relied heavily on the consulting physicians' opinions, which pre-dated D.Y.'s hospitalization and subsequent psychosis diagnosis. (A.R. 223, 229, 261, 266.) Obviously, the evidentiary landscape pertaining to D.Y.'s condition changed dramatically with her April 2008 hospitalization and the resulting evidence documenting her auditory hallucinations. The consulting physicians did not consider this evidence, and therefore their opinions do not provide substantial evidence to support the ALJ's conclusion regarding the application of the psychosis listing. Nor does the ALJ's reference to the ME's testimony provide much assurance, considering that the ME testified that listing 112.03 is a close match and then provided no explanation for her conclusion that D.Y.'s impairments nonetheless do not meet or medically equal the criteria. (A.R. 38-39.) Accordingly, the ALJ's failure even to mention the listing for psychosis, coupled with the unsupported analysis at step-three, "has left this court with grave reservations as to whether [the ALJ's] factual assessment addressed adequately the criteria of the listing." *Scott*, 297 F.3d at 595.

The government defends the ALJ's analysis of the listings by relying on the doctrine of harmless error, arguing that a remand is only warranted if there is evidence that D.Y.'s psychosis meets the criteria set forth in listing 112.03. (R. 27, Gov't Mem. at 6-8.) The

government analyzes the evidence in light of the listing criteria—an exercise that the ALJ did not engage in herself—and argues that Brownlee cannot show that D.Y.'s psychosis meets those criteria. (Id.) The government thus concludes that any error on the ALJ's part in failing to reference listing 112.03 is harmless.

Although the doctrine of harmless error "is fully applicable to judicial review of administrative decisions," *see Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003), recently the Seventh Circuit has criticized the government's over-reliance on the doctrine in the social-security context, *see, e.g., McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The harmless-error doctrine applies where the court is "convinced" that a remand would be pointless because the ALJ would reach the same result. *McKinzey*, 641 F.3d at 892. "But the fact that the administrative law judge, had she considered the entire record, *might* have reached the same result does not prove that her failure to consider the evidence was harmless." *Spiva*, 628 F.3d at 353 (emphasis added). The Seventh Circuit has instructed the government to reign in its tendency to cull the administrative record for evidence "besides evidence discussed by the administrative law judge" to find support for the ALJ's decision, *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). That is because the *Chenery* doctrine precludes the government from defending an agency's decision on grounds that do not appear in the decision itself. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

15

Here, the government's defense of the ALJ's decision runs right into the category of criticism highlighted above. The government points out that listing 112.03 requires symptoms that persist either intermittently or continuously for a period of six months, and asserts that there is no evidence to support that criteria. But the ALJ never conducted that analysis, and so the government's reasons rub up against the *Chenery* principle. *See Larson*, 615 F.3d at 749. Moreover, the government's assertions represent a myopic view of the record. In the first psychological evaluation on record, conducted 10 months before D.Y.'s hospitalization, Langgut noted that D.Y. speaks in a "baby voice" and experiences "mild phobias." (A.R. 229-30.) Eight months later, White found there to be "no concrete evidence of psychosis," but noted that D.Y. had imaginary friends. (Id. at 262.) Just two months after White's evaluation D.Y. was hospitalized after her hallucinatory imaginary friends told her to kill her mother and herself. During the hospitalization, D.Y.—who was 10 at the time—told her doctor that her hallucinations began when she was six years old. (Id. at 305.) Given this longitudinal evidence regarding D.Y.'s hallucinations or delusions, the ALJ might have found that her impairments meet the six-month criteria had she explicitly considered the question.

The government also argues that Brownlee failed to show that D.Y. meets the "B criteria," which requires medically documented evidence of marked impairments in two of the following areas: cognitive/communicative functioning, social functioning, personal functioning, and difficulties in maintaining concentration, persistence, or pace. *See* 20

16

C.F.R. Part 404, Subpt. P, App. 1, 112.03(B). The government argues that D.Y.'s post-hospitalization treatment at Aunt Martha's Youth Service Center is insufficient to support this criteria. (R. 27, Gov't Mem. at 8.) Once again, the ALJ did not conduct the analysis that the government engages in here, and the court is not convinced that if she had the denial of benefits would stand. *See McKinzey*, 641 F.3d at 892. D.Y.'s cognitive deficits are well-documented and undisputed. Langgut noted 10 months before D.Y.'s hospitalization that she has "limited social relationships." (A.R. 230.) And the records from Aunt Martha's show that D.Y. was still prescribed an anti-psychotic medication eight months after her hospitalization. (Id. at 563.) In light of that evidence, the court cannot conclude that the ALJ's decision to brush past listing 112.03 amounts to harmless error, and accordingly, a remand is necessary to allow the ALJ to provide the requisite logical bridge between the evidence and her conclusions. *See Giles*, 483 F.3d at 487.

The court is also persuaded by Brownlee's argument that the ALJ inadequately explained D.Y.'s level of functioning in the categories of interacting and relating with others and caring for yourself. With respect to the former, she begins by stating, without further detail, that the ME opined that D.Y. has less than a marked limitation. (A.R. 17.) She then lists some evidence from Shable's report of D.Y.'s third grade report supporting that conclusion, while ignoring the aspects of Shable's report that detract from it—specifically, that at times D.Y. "shuts down" and "will not answer anyone." (Id. at 145.) The ALJ then lists some of the way in which Pajek's report points to a finding of a marked limitation in this

domain, including her notation of D.Y.'s "very serious" problems seeking attention and expressing anger appropriately, asking permission, and following rules. (Id. at 17.) But nowhere in this list of evidence is there any analysis to help the court understand how the ALJ concluded that the balance of this conflicting evidence weighs toward a "less than marked" finding. The ALJ noted elsewhere that she gave "very substantial weight" to the ME's opinion, (id. at 15), but she did not explain what weight she gave the teachers' opinions, which seem important given the teachers' consistent contact with D.Y. over extended periods of time. Nor did the ALJ analyze, as the regulations require, how D.Y. would function outside the supportive setting of her special-education classroom. *See* 20 C.F.R. § 416.924a(b)(5)(iv)(C). Put simply, the ALJ did not engage with the facts in any way that would allow the court to review how she arrived from the list of evidence to the conclusion that D.Y. is not markedly limited in this domain.

The absence of analysis makes the court's job especially difficult here where the ME's explanation for her opinion in this domain was terse and partly conflicts with the record. The ME acknowledged that D.Y. tends "to shut down and isolate," but dismissed her behavior as not "being marked" without explaining why. (A.R. 41.) Her only explanation is that she saw evidence in the record that D.Y. jokes around and plays at school with others. (Id.) Actually, the record is rife with evidence that D.Y. has almost no friends, spends time at school talking to herself, and consistently cuts herself off from others. (Id. at 47-48, 145, 147, 155, 230, 341, 538.) On remand, to the extent that the ALJ concludes that D.Y. does

18

not meet the psychosis listing she should reevaluate the evidence in this domain, and provide the requisite logical bridge from that evidence to her conclusion. *See Giles*, 483 F.3d at 487.

The same holds true for the ALJ's analysis in the caring for yourself domain. Once again, the ALJ cites the ME's conclusion that D.Y. is not markedly limited in this domain, then lists some supportive excerpts from Shable's report before turning back to Pajeck's report and saying that the "very serious" problems she notes were being addressed in the special education setting. But the fact that Pajeck had implemented a rewards system to address D.Y.'s problems in this domain is not evidence that the system was working or counteracting D.Y.'s "very serious problems." On the contrary, Pajek reported that D.Y. failed to "interact with peers and adults appropriately on a daily/hourly (sometimes) basis." (A.R. 538.) Notably absent from the ALJ's catalogue of evidence in this domain are D.Y.'s menacing hallucinations directing her to harm herself and the records documenting her tendency to bang her head or scratch her skin when upset. (Id. at 342, 357.) Moreover, the ME testified that she did not view D.Y.'s tendency to leave the classroom and wander the halls by herself as an issue in this domain, even though the regulations make clear that caring for yourself includes the ability to follow safety rules, *see* 20 C.F.R. § 416.926a(k)(3)(iv), and her teacher expressly described this behavior as a safety concern, (A.R. 555). Because the ALJ has simply catalogued some evidence without explaining how that evidence weighs in favor of her conclusion, the court again is left with little to review. The ALJ should provide that analysis if she proceeds to step three on remand.

A final issue that merits attention: the ALJ dismissed Brownlee's testimony as "not persuasive" because, the ALJ said, "[s]he testified that she is often asked to come to school and take the claimant home, but the recent teacher report indicates that she currently does not have a high degree of absenteeism, in contrast to earlier reports." (A.R. 15.) It is unclear from the record whether D.Y.'s school counts as an "absence" episodes where D.Y. reports to school but is asked to leave early. According to Brownlee, many times when she is called to pick D.Y. up, the school does not "write her up." (Id. at 35.) This raises the question whether any inconsistency between D.Y.'s recorded absenteeism and Brownlee's reports of the frequency with which she is called can be explained by the school's failure to record the episodes Brownlee references. It is a question the ALJ should flesh out before discounting all of Brownlee's testimony solely on the basis of what might not be an inconsistency after all.

### Conclusion

For the reasons set forth above, Brownlee's motion for summary judgment is granted and the government's is denied. The decision of the ALJ is vacated and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**